BANKERS SECURITY LIFE
INSURANCE SOCIETY,
Plaintiff–Appellant,

v.

Judith S. KANE, f/k/a Judith S. Katz, as owner and beneficiary of the life insurance policy of Arthur H. Kane, etc., Defendant–Appellee. (Two Cases)

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff–Appellant,

v.

Judith S. KANE/KATZ, as owner and beneficiary of life insurance policy of Arthur H. Kane, etc., Defendant–Appellee.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff–Appellant,

v.

Judith S. KANE f/k/a Judith S. Katz, as owner and beneficiary of the life insurance policy of Arthur H. Kane, etc., Defendant–Appellee.

Nos. 88–5693, 88–5851 and 88–6008.

United States Court of Appeals,
Eleventh Circuit.

Oct. 10, 1989.

Shelley H. Leinicke, Wicker, Smith, Blomovist, Tutan, O'Hara, McCoy, Graham & Lane, Ft. Lauderdale, Fla., for Prudential.

Alan H. Fein, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, Fla., for Bankers.

David C. Pollack, Stroock, Stroock & Lavan, Miami, Fla., for defendant-appellee.

Before ANDERSON and COX,
Circuit Judges, and SHOOB *, District Judge.

SHOOB, District Judge:

Arthur Katz ("Katz") obtained life insurance policies from appellants Bankers Security Life Insurance Society ("Bankers") and Prudential Insurance Company of America ("Prudential"), naming his wife, Judith Katz ("Mrs. Katz"), as beneficiary.

* Honorable Marvin H. Shoob, U.S. District Judge for the Northern District of Georgia, sitting by designation.

Appellants brought declaratory judgment actions seeking to void the policies after Katz's death. Each complaint also included a count for fraudulent misrepresentation. The district court dismissed both cases with prejudice because they were brought after the two-year contestability period provided by the policies. That decision is affirmed.

## BACKGROUND

During 1976 Arthur Katz testified for the United States in a stock manipulation case. Katz's testimony purportedly sent twenty people to jail, including an associate of an alleged organized crime leader. Katz subsequently received death threats and in late 1976 or 1977 the Attorney General of the United States authorized his inclusion in the Federal Witness Relocation Program.

About the same time that he was approved for the witness protection program, Katz and three members of his law firm were indicted for scheming to defraud insurance companies. Katz pled guilty, testified against his co-defendants, and received a sentence of six months in a halfway house and a $5,000 fine. Katz and his wife then changed their names to Kane and moved to Florida under the witness protection program. They obtained new driver's licenses, social security numbers, and jobs as Mr. and Mrs. Kane.

Using his new identity as a former government attorney (he had been disbarred for his role in the insurance fraud scheme) with no significant prior history, Kane obtained two life insurance policies from Bankers totalling $1,000,000 and one from Prudential for $500,000. His wife was named as his beneficiary. The insurance companies did a routine background check on Kane and found no criminal history.

From 1984 to 1987, Kane invested heavily in the stock market, reportedly accumulating $7 million in assets. On "Black Monday," the day the stock market crashed in 1987, he went into the offices of his stockbroker, shot and killed the office manager, shot and wounded his stockbroker, and then committed suicide. When Mrs. Kane sought to recover the insurance proceeds, appellants filed suits to void the policies and to recover damages in tort for fraud.

The district court dismissed with prejudice and without leave to amend, 689 F.Supp. 1164, and granted attorney's fees to appellees. 692 F.Supp. 1326. The district court found that incontestability clauses in the policies precluded suit. The district court also concluded that there were no false statements on which to base a tort action. Appellants argue that the district court erred because Katz's failure to disclose his criminal past rendered the contracts void *ab initio*. They contend that they should have been given leave to amend their complaints to assert that they never insure persons with criminal records and to show that the fraud was material to the issuance of the policy.

## DISCUSSION

■ Essentially, appellants seek a court-created exception to the Florida rule that insurance policies are incontestable after they have been in effect for two years. Fla.Stat. § 627.455 (1984). Appellants correctly argue that the purpose of this statute is to create a reasonable time period during which insurance companies can investigate applicants and void policies issued in error, while protecting consumers from untimely efforts to void policies. *See Prudential Insurance Company v. Prescott,* 130 Fla. 11, 176 So. 875 (1937). Appellants maintain that this purpose is not served, however, by enforcing the incontestability clauses at issue here.

Appellants urge the Court to adopt the reasoning of several Pennsylvania cases that have created an "imposter" exception where the insurance company, through reasonable investigation, could not have discovered fraud in the issuance of a policy. *See Ludwinska v. John Hancock Life Insurance Co.,* 317 Pa. 577, 178 A. 28 (1935); *Petaccio v. New York Life Insurance Co.,* 125 Pa.Super. 15, 189 A. 697 (1937); *see also Unity Mutual Life Insurance Co. v. Moses,* 621 F.Supp. 13 (E.D.Pa.1985). Appellants maintain that in such cases no contract exists (and no incontestability

clause) because there is no meeting of the minds as to the identity of the insured.

Although appellants present a novel argument, it must fail based on the strict construction of incontestability clauses under Florida law. The most relevant Florida decision is *Prudential Insurance Co. v. Rhodriquez*, 285 So.2d 689 (Fla.Dist.Ct. App.1973). In *Rhodriquez*, the court rejected Prudential's untimely efforts to rescind an insurance policy based on misrepresentations regarding the insured's health. The court was not persuaded by the argument that the insurance company would not have issued the policy if it had known the insured's health and medical history.

*Rhodriquez* presented an ideal situation for the Florida court to create a fraud or imposter exception to the incontestability rule. Unlike the alleged fraud in this case, the fraud in *Rhodriquez* related directly to the cause of the insured's death. The refusal of the Florida court to adopt an exception to the incontestability statute in *Rhodriquez* controls this appeal. We will not create exceptions to Florida law or void insurance policies *ab initio* in a manner that would undermine the intent of the Florida legislature and the practice in the Florida courts.

We also reject appellants' argument that the district court should not have dismissed their complaints without leave to amend. Any amendments to the complaints would have been futile. There is no set of facts upon which appellants could succeed because the district court correctly held that appellants are not entitled to an exception to Florida's incontestability statute.

■ Finally, appellants cannot bring a separate tort suit for fraud. Appellants' reliance on *Guarantee Trust Life Insurance Co. v. Wood*, 631 F.Supp. 15 (N.D.Ga. 1984), is misplaced. In *Wood* the court held that "an independent action in tort based on fraud and deceit arising out of a contract is not a suit for the violation of the contract but involves affirmance of the contract." *Id.* at 20. As a result, the *Wood* court held that incontestability clauses were not violated by a fraud suit. *Id.* at 21. Although *Wood* may have involved facts that justified the court's ruling, in this case a fraud suit would merely provide a different means to challenge the validity of the insurance contract. The district court properly rebuffed appellants' efforts to evade the Florida incontestability statute in this manner.

CONCLUSION

Because appellants filed suit after the contestability period under the policies in question, the judgment of the district court and the award of costs and attorney's fees to appellee is AFFIRMED.